UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Diane[1] Lemon, | ) | Civil Action No. 5:18-2910-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| Andrew Saul,[2] Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court affirms the Commissioner's decision for the reasons discussed herein.

I.      Relevant Background

A.      Procedural History

On October 1, 2014,[3] Plaintiff protectively filed for DIB under Title II of the Act, 42 U.S.C. §§ 401-433, alleging she became disabled on September 19, 2014. Tr. 274-75. After being denied initially, Tr. 168, and upon reconsideration, Tr. 197, Plaintiff requested a hearing

---

[1] At times the record spells Plaintiff's first name "Diann." E.g., Tr. 1. Although Plaintiff noted in her application that she had spelled her first name "Diann" at times, Tr. 274, her court documents are filed as Diane Lemon.

[2] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* Section 205(g) of the Social Security Act, 42 USC § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[3] Although the Application Summary is dated October 6, 2014, Plaintiff's protected filing date,

before an Administrative Law Judge ("ALJ"), Tr. 215-16. ALJ Brian Garves conducted a hearing on June 14, 2017, taking testimony from Plaintiff, lay witness Marion Lemon, and Vocational Expert ("VE") Carroll H. Crawford. Tr. 93-129. Representing Plaintiff at that hearing was her attorney, Brett Owens. Tr. 95. The ALJ denied Plaintiff's claim in a decision dated September 25, 2017. Tr. 72-83. On November 20, 2017, Plaintiff requested review of this decision from the Appeals Council, Tr. 273, which denied her request on October 15, 2018, Tr. 1-4. Plaintiff brought an action seeking judicial review of the Commissioner's decision in a Complaint filed October 26, 2018. ECF No. 1.

B.    Plaintiff's Background

Plaintiff was born in May 1963 and was 51 years old as of her alleged onset date of September 19, 2014, and 55 years old as of her date last insured of December 31, 2018. Tr. 336. In her October 2014 Disability Report-Adult-Form Plaintiff indicated that she completed high school, had no specialized job training, and did not complete trade or vocational school. Tr. 307. She listed her past relevant work ("PRW") as a bus driver in the City Transportation business, a job she held from 1998 until she stopped working in September 2014. Tr. 306-07. Plaintiff indicated she stopped working on September 19, 2014, because of her medical conditions, which she listed as blood clots, diverticulosis, sleep disorder, chronic fatigue, migraines, high blood pressure, high cholesterol, anxiety, chronic joint pain, severe arthritis and bone spurs left elbow, inflammation on small intestine, and surgery on feet. Tr. 306. In her November 2014 Function Report-Adult Plaintiff indicated she had no problems handling her personal care and grooming, but her husband had to remind her about her medication. Tr. 327-28. Plaintiff indicated she prepared complete meals once or twice a week, did cleaning and laundry one-to-two hours per

---

as noted on the Disability Determination and Transmittal, is October 1, 2014. *See* Tr. 168.

day, went outside once a week to ride in a car, and shopped for food and clothing. Tr. 329. Plaintiff indicated she could drive and could go out alone. *Id.* Plaintiff indicated she watched television, talked with family and friends on the phone, and attended church every Sunday. Tr. 330. Plaintiff indicated she could walk 40-to-50 yards before being out of breath and needing to rest and could pay attention for two-to-three hours. Tr. 331. She indicated she did not handle stress well and could handle a change in routine "ok sometime." Tr. 332.

In a subsequent Disability Report-Appeal dated May 13, 2015, Plaintiff indicated a change in her condition since her last report noting that her depression was worse, her migraines were more frequent and severe, her insomnia had worsened, and her pain had increased. Tr. 339. Plaintiff also indicated that, as of approximately January 2015, she began having more flare-ups of diverticulosis, more frequent panic attacks, more frequent migraines, and now had neuropathy in her right foot. *Id.* Plaintiff indicated that, since her last report of activities, things had changed in that her husband helped put medication on her back and feet and helped her out of the bathtub. Tr. 346. Plaintiff also indicated she did not get out much. Tr. 346.

C.      Administrative Proceedings

On June 14, 2017, Plaintiff appeared with counsel at an administrative hearing in Columbia, SC and testified regarding her application for DIB. Tr. 93-129. Plaintiff's husband, Marion Lemon, and VE Crawford also appeared and testified at the hearing. *Id.*

1.      Plaintiff's Testimony

In response to questions from the ALJ Plaintiff testified that she lived with her husband. Tr. 100. Plaintiff testified that her most recent employment had been as a bus driver for the City of Columbia, a position she held for 15 1/2 years. Tr. 101. Plaintiff testified that her health began to deteriorate in 2013 when she had several operations, including having part of her colon

removed and having a heart catherization. Tr. 102. Plaintiff indicated she began suffering with

pulmonary embolism in 2013. *Id.* Plaintiff indicated she had been suffering joint pains for the

last seven or eight years but that it had increased in time and had become almost unbearable. Tr.

102-03. Plaintiff said she hurt from her arm, back, and knees. She said that, at the time of the

hearing, she was having treatments by receiving injections in her knees and wrists. Tr. 103.

Plaintiff stated she was receiving injections from Dr. Masonni Masonway [phonetic] with USC

Orthopedics[4] and had received injections from her "regular physician" for at least eight years. Tr.

103.

Plaintiff stated she would take short walks around the block on her "better days," but

when asked about trying to get to 10,000 steps per day as she had discussed with her

cardiologist, Plaintiff indicated she had "fallen off the bandwagon" because it became

overwhelming and she would get out of breath. Tr. 104.

When asked about her anxiety, Plaintiff indicated it became significant to her in 2013 but

it had begun prior to that although she had tried to manage it on her own. Tr. 104. Plaintiff

indicated her anxiety made her not want to go outside and be around other people. Tr. 104. She

said she also had depression, and she took Xanax and sleep medication to help her with sleep. Tr.

105. Plaintiff stated the Xanax helped "somewhat" with her anxiety, calming her so that she

---

[4] At the hearing both the ALJ and Plaintiff's counsel indicated they had no records from USC Orthopedics. Tr. 103. The ALJ declined to keep the record open for those records to be added; however, he indicated he would consider them if they had been provided before his decision was issued. Tr. 127. In the ALJ's decision he indicated the additional records were not considered. Tr. 71. Subsequent to the hearing Plaintiff's counsel supplied the Appeals Council with additional documents, including a two-page record from Plaintiff's October 2017 visit to Dr. Andy McGown at USC Orthopedics Group. Tr. 51-52. However, the Appeals Council did not consider the October 2017 evidence, finding it did not relate to the period at issue. Tr. 2. No issues relating to the USC Orthopedics Group records have been raised on appeal.

could leave the house. Tr. 105. She said she could occasionally do some shopping, but that she could not drive because the sleep aid and Xanax made her sleepy. Tr. 105-06.

Plaintiff testified that she got shortness of breath when exercising or sometimes with general walking from one side of her house to the other. Tr. 106. Plaintiff indicated she could sit for a "good hour" before having to stand up, and she could stand for 25-30 minutes before needing to sit down. Tr. 106. Plaintiff believed that, with her joint issues and considering a prior surgery for tendonitis on her right arm, she could only lift 10 pounds. Tr. 106. Plaintiff further explained that the surgery had been on her right wrist and that she was right-handed. Tr. 107.

Plaintiff indicated she was taking two types of medication for her diabetes and that a complication of her diabetes was that she was "very, very fatigued" on a average day. Tr. 107. Another side effect from the diabetes medication is that Plaintiff would need to go to the restroom a lot and would sometimes get very nauseated. Tr. 107-08.

Plaintiff indicated she constantly has severe lower abdominal pain from her diverticulitis. Tr. 108. Plaintiff noted she had had several feet of her intestine removed in 2013 but that the problem "still exist[s] and occasionally it flares up." Tr. 108. Plaintiff indicated she could go months without a flare-up but then she could have a flare-up with daily pain. Tr. 108.

In response to questions from the ALJ about her daily activities Plaintiff indicated she could take showers on her own most of the time but that her husband would assist her sometimes when she was feeling very weak. Tr. 108-09. Plaintiff indicated that, when she was feeling "okay," she would try to make a meal and do general house chores such as occasional laundry ordishes. Tr. 109. Plaintiff indicated she did still drive. Tr. 109. Plaintiff indicated that her son came to check on her about once a week but that she did not participate in social activities outside the home. Tr. 113.

Plaintiff's counsel then asked Plaintiff to describe her average day. Tr. 109. Plaintiff testified that she would get up at about 10:00 a.m. and eat a sandwich or cereal with her medication. She may then start preparing dinner but she cannot prepare a meal at one time because she may feel nauseous standing. Tr. 109-10. It may take her from 10:00 a.m. until 3:00 p.m. to finish a task. Tr. 110. Plaintiff indicated that her husband still works and that he usually manages her medications for her. Tr. 110. Plaintiff stated that on a "bad day" she would just eat, take her medication, and lie down. She estimated she had about three or four bad days in an average week. Tr. 110. Plaintiff stated that during an average week she did not leave the house, but that she may leave the house two or three times per month. Tr. 111. When she leaves the house it is usually with her husband. Tr. 111. Plaintiff said she shopped occasionally and would try to go out every two months to treat herself if she felt well enough. Tr. 111. Plaintiff noted that she still drives but that her husband does the grocery shopping. Tr. 111-12. Plaintiff also noted she has diabetic neuropathy that causes a burning sensation in her left foot if she stands or walks for a long time. Tr. 112. Plaintiff indicated she could probably walk 10 minutes or so before having problems, then she has to stop and take a five-to-ten-minute break before resuming her walk. Tr. 113.

Plaintiff again noted her problems sleeping, indicating that she had difficulty sleeping and difficulty staying asleep. Tr. 114. She takes medication, but it does not work too well. She feels groggy and very nervous when she does not get enough sleep. Tr. 114.

Plaintiff indicated she did not have any real hobbies, but she would try to watch television or read magazines sometimes. Tr. 115.

When asked more about her anxiety, Plaintiff indicated it began after 9/11 (2001) when her husband was at war but she had first been diagnosed with anxiety in 2012 or 2013. Tr. 115. Sirens, certain things on television, and large crowds cause her anxiety. Tr. 116.

2.    VE's Testimony

The VE confirmed that Plaintiff's PRW was as a bus driver, which is medium, semiskilled work with an SVP of 4 and a Dictionary of Occupational Titles ("DOT") listing of 913.463-010. Tr. 117. In his first hypothetical the ALJ asked the VE to assume someone of the same age, education, and past work experience as Plaintiff (54 years old with a high school or greater education) with the following residual functional capacity:

> [T]he ability to lift and carry up to 50 pounds occasionally, 25 pounds frequently. She can sit for six hours in an eight hour shift. She can stand for six hours in an eight hour shift and walk for six hours in an eight hour shift. She can frequently climb ramps or stairs, never climb ladders, ropes or scaffolds and she can frequently balance, stoop, kneel, crouch and crawl. She can have occasional exposure to hazards such as unprotected heights and moving machinery. Her work [] would need to be limited to simple, repetitive tasks but she could not work at production rate pace. She could have frequent interaction with supervisors and co-workers and occasional interaction with the public.

Tr. 117-18. The ALJ asked if such a hypothetical individual could perform Plaintiff's past work and the VE testified that she could not. Tr. 118. The VE testified that there would be other jobs in the national economy that this individual could perform. He cited the following examples of unskilled jobs at the medium level: hand packager, SVP 2, DOT 920.587-018, with 105,000 in the United States; mail handler for bulk mail, SVP 2, DOT 209.687-014, with 84,000 in the United States; order filler, SVP 2, DOT 922.687-058, with 102,000 jobs. Tr. 118.

In his second hypothetical the ALJ asked the VE to assume an individual with the same vocational factors and limitations as in the first hypothetical, except the individual could lift and carry up to 20 pounds occasionally and 10 pounds frequently. Tr. 119. The VE opined that there

would be jobs that such an individual could perform. Tr. 119. The VE noted these would be light jobs and offered the following examples: stock checker, unskilled, SVP 2, DOT 299.667-014, with 142,000 jobs in the United States; office settings such as office helper, light, unskilled, SVP 2, DOT 239.567-010, with 168,000 jobs in the United States; price marker, light, unskilled, SVP 2, DOT 209.587-034, with 77,000 jobs in the United States. Tr. 119. The VE opined that Plaintiff's skills from her PRW were very specific to her work and would not be transferable generally. Tr. 199. The VE indicated his testimony was in accordance with the DOT. Tr. 119.

Counsel for Plaintiff asked the VE what would be the effect on the work he identified if Plaintiff were out of work for three or more days per month because of having "bad" days. Tr. 120. The VE responded that she would not be able to perform any of the jobs he identified. Tr. 120. In response to a question from counsel, the VE indicated that it would vary with employer how many days an employee could miss per month, but that he had found it typically was two days. Tr. 120. The VE was not able to answer counsel's question about whether an individual could miss two days per month if starting a new job. Tr. 120.

3.      Lay witness, Mr. Lemon

Plaintiff's counsel called Plaintiff's husband, Marion Lemon, to the stand. Tr. 121-22. Lemon testified that he had seen Plaintiff's health deteriorate since she went out of work in 2014. Tr. 123. Lemon testified that he and Plaintiff went out once or twice a month and that he did 80-to-90 percent of things at the house. Tr. 123-24. Lemon stated that on some days Plaintiff was in bed because of chronic pain. Tr. 125.

II.     Discussion

A.     The ALJ's Findings

In his October 18, 2017 decision, the ALJ made the following findings of fact and

conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.      The claimant did not engage in substantial gainful activity since September 19, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: major joint dysfunction in the knees bilaterally and left elbow, major depressive disorder, generalized anxiety disorder, history of pulmonary embolism and currently treated with chronic anti-coagulation therapy, diabetes mellitus, peripheral neuropathy, and diverticulitis (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except for the following: lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently; sitting, standing and/or walking for six hours in an eight-hour workday; she can push and/or pull as much as she can lift and/or carry; she can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; she can frequently balance, stoop, kneel, crouch, and crawl; she can have occasional exposure to hazards such as unprotected heights and moving machinery; her work is limited to simple, routine, and repetitive tasks, but not at a production rate pace; and she can have frequent interaction with supervisors and coworkers, and occasional interaction with the public.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on May 26, 1963, and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 19, 2014, through the date of this decision (20 CFR 404.1520(g)).

Tr. 73-77, 80-82.

B.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[5] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.  Analysis

Plaintiff alleges that (1) the ALJ erred in determining she did not satisfy the requirements of Listing 12.04; (2) the ALJ failed to properly consider her multiple impairments in combination; and (3) the ALJ's residual functional capacity ("RFC") assessment is not supported by substantial evidence. Pl.'s Br. 2, ECF No. 11.

1.  Listing 12.04

Plaintiff contends that the ALJ erred in determining that her "host of mental impairments" fail to meet the requirements of Listing 12.04. Pl.'s Br. 2. Plaintiff alleges she satisfies the criteria for paragraphs A and B. Pl.'s Br. 2–5. The Commissioner notes that only paragraph B is at issue in this case and asserts that substantial evidence supports the ALJ's Step Three finding that Plaintiff has not satisfied paragraph B. Def.'s Br. 11-13, ECF No. 12.

Listing 12.04 concerns "depressive, bipolar and related disorders" and contains A, B, and C criteria.  *See* 20 C.F.R. 404, subpt. P, app. 1, § 12.04.  Listing 12.04 may be satisfied if the claimant satisfies the "paragraph A" and "paragraph B" criteria or the "paragraph A" and "paragraph C" criteria. *Id.* Plaintiff submits she has satisfied paragraphs A and B. As an initial matter, Plaintiff notes that the ALJ did not discuss paragraph A, which concerns specific medical documentation. Pl.'s Br. 3. In any event, Plaintiff submits the decision demonstrates paragraph A was satisfied, citing to record evidence. *Id.* (citing Tr. 593-95, 562-65, 566-71, 645-96, 849-57). The Commissioner does not dispute Plaintiff's argument that she has satisfied the paragraph A criteria, noting that only paragraph B is at issue herein. Def.'s Br. 11 n.1. For purposes of this Order, then, the court focuses only on the "paragraph B" criteria.

To satisfy the "paragraph B" criteria, the mental impairments must result in either "extreme" limitation in at least one or "marked" limitation in at least two of the following four areas of mental functioning: (1) difficulties in understanding, remembering, or applying information; (2) difficulties in interacting with others; (3) difficulties in maintaining concentration, persistence, or pace; or (4) difficulties in adapting or managing oneself. 20 C.F.R. Part 404, subpt. P, app. 1, § 12.04. A "marked limitation" occurs when "functioning in [an] area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00.F.2. An "extreme limitation" occurs when a claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.*

Plaintiff avers that the ALJ's finding that she did not meet the "B" criteria of Listing 12.04 was erroneous because the evidence of record shows at least marked limitations in all four areas of mental functioning. Going through each of the four areas of mental functioning, Plaintiff cites to various portions of the record, arguing the ALJ's findings of less than marked impairment were erroneous and mischaracterized some evidence. Pl.'s Br. 4-5.

Regarding the first area of mental functioning—understanding, remembering, or applying information—the ALJ found that Plaintiff had mild difficulties. Tr. 76. Regarding the mild finding in "understanding, remembering, and applying information," the ALJ cited to Plaintiff's "Function Report-Adult," which Plaintiff completed in June 2015. Tr. 76 (citing to ex. 9E, found at Tr. 349-67). The ALJ noted that Plaintiff alleged difficulty with paying bills, going to doctors' appointments without reminders, and taking medications without reminders. Tr. 76. However, the ALJ noted that Plaintiff also indicated she could "perform light household chores, prepare meals, shop, and drive." Tr. 76 (citing ex. 9E3, *see* Tr. 351).

In challenging this portion of the ALJ's Paragraph B findings Plaintiff submits the ALJ "mischaracterizes the evidence," as Plaintiff's statement regarding meal preparation indicated she "sometimes" prepared meals and made "sandwiches and cereal." Pl.'s Br. 4 (citing Tr. 351). Plaintiff also cites to Plaintiff's comments in the Function Report that she had difficulty understanding the form and had her husband assist her in completing it. Pl. Br. 4 (citing Tr. 363). Further, Plaintiff argues these activities do not relate to Plaintiff's ability to "learn, recall, and use information." *Id.* at 3-4 (quoting 20 C.F.R. 404, Subpt. P, App. 1 (E)(1)).

In response, the Commissioner argues that Plaintiff's allegations of error do no more than seek to have the court re-weigh the evidence of record to arrive at a different result. As the Commissioner notes, the "fact that plaintiff or even the Court would have weighed the evidence differently [or reached a different conclusion] is of no moment." *Hall v. Colvin*, No. 12-1692, 2013 WL 3762902, at *5 (D.S.C. July 16, 2013). Regarding the allegation that the ALJ did not focus on evidence germane to Plaintiff's ability to "learn, recall, and use" information, the Commissioner submits that Plaintiff's limited mental-health treatment made that difficult. Rather, the Commissioner submits the ALJ necessarily looked to Plaintiff's own statements regarding her functioning to determine whether Plaintiff satisfied the Paragraph B criteria. Def.'s Br. 12.

In addition, the Commissioner notes that mental-status consultative examiner Paulette Muni, Ph.D.[6] examined Plaintiff and found she had the "intellectual capacity to be employed"

---

[6] Paulette Muni Ph.D. examined Plaintiff in connection with her disability application. Tr. 562-64. In the March 2015 report Dr. Muni diagnosed Plaintiff with "Major Depressive Episode, current [and] Generalized anxiety disorder." Tr. 564. On examination Plaintiff was found to be oriented to person, place, time, and situation. Her judgment and insight were good, testing indicated intact cognitive functioning, and her intelligence appeared to be in the normal range. Tr. 563. Dr. Muni found Plaintiff's thought process to be clear. Tr. 563. Plaintiff's attention and concentration were generally good; her mood was depressed and anxious. Tr. 563. Plaintiff was

although noting Plaintiff's "depression and anxiety make it difficult for her to interact with others." Tr. 564 (March 4, 2015 Mental Status Examination Report). The ALJ discussed Dr. Muni's findings, including the finding that Plaintiff had the "intellectual capacity to be employed" elsewhere in his decision. Tr. 78.[7] It is, generally, the responsibility of the ALJ to decide the legal question of whether a listing is met by a claimant's impairments. *See* SSR 96-6p. After reviewing the record, the court finds that the ALJ followed the appropriate procedure for explaining his Listing determination. He set forth the criteria for meeting the Listings, compared the Listing criteria with Plaintiff's symptoms, and explicitly stated his reasons for finding that Plaintiff's mental impairments did not meet a Listed impairment. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *See also, McCarty v. Apfel*, 28 F. App'x 277, 279–80 (4th Cir. 2002) (finding that "the ALJ need only review medical evidence once in his decision" and therefore, the ALJ's thorough analysis of the medical evidence at step four was sufficient to determine whether claimant satisfied step three).[8] The ALJ's discussion of the medical evidence throughout

---

able to "correctly follow simple commands presented verbally and in written form." Tr. 563. Dr. Muni recounted Plaintiff's activities, which include going to the gym three times per week, performing household chores, and completing ADLs (activities of daily living) independently without reminders. Tr. 564.

Based on her examination, Dr. Muni opined that Plaintiff "has the intellectual capacity to be employed." Tr. 564. Dr. Muni stated that Plaintiff could understand, remember, and carry out simple instructions but that Plaintiff would have difficulty with complex instructions. Tr. 564. With respect to social functioning, Dr. Muni opined that Plaintiff's "depression and anxiety make it difficult for her to interact with others" and noted it "would be emotionally difficult for her to persist in work related activity at a reasonable pace." Tr. 564.

[7] The ALJ gave only partial weight to the opinion of Dr. Muni as it was "based primarily on an interview with [Plaintiff] without the benefit of seeing any records of significant anxiety or depression problems or treatment." Tr. 80.

[8] *See also Kiernan v. Astrue*, No. 12-cv-459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) ("Where the ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion in his Step 3 analysis."); *Stevenson v. Astrue*, No. 10-cv-01565, 2011 WL 4501914, at *4 (D.S.C. Sept. 28, 2011) (finding it was not reversible error where the ALJ sufficiently addressed whether the claimant satisfied step three in his analysis of the evidence "in the latter portion of his decision"); *Buchanan v. Astrue*, No. 10-cv-167, 2011

his decision provided enough information to determine there was substantial evidence to support his non-disabled finding. *Schoofield v. Barnhart*, 220 F. Supp. 2d 512, 522 (D. Md. 2002) (finding that remand is not necessary "where it is clear from the record which listing or listings in the [Listing of Impairments] were considered, and there is elsewhere in the ALJ's opinion an equivalent discussion of the medical evidence relevant to the Step Three analysis which allows this Court to readily determine whether there was substantial evidence to support the ALJ's Step Three conclusion").

Substantial evidence supports the ALJ's finding of mild limitations in the area of understanding, remembering, and applying information. The ALJ did not err in this finding.

Plaintiff makes similar arguments regarding the three other portions of the Paragraph B criteria. The ALJ found Plaintiff had moderate limitations in interacting with others; moderate limitations in concentration, persistence, or pace; and mild limitations in adapting or managing oneself. Tr. 76. Addressing Plaintiff's moderate limitation in "interacting with others," the ALJ noted Plaintiff claimed to have difficulty engaging in social activities; however, he ALJ noted that Plaintiff had also indicated she was able to shop and attend church. Tr. 76 (again citing ex. 9E). Regarding Plaintiff's ability to "concentrate, persist, or maintain pace," the ALJ noted Plaintiff's claimed difficulties understanding the Function Report (ex. 9E5) but noted Plaintiff's statements that she was able to prepare meals, watch television, and manage some funds (ex. 9E4). Tr. 76. Regarding Plaintiff's "ability to adapt or manage herself" the ALJ found Plaintiff had mild impairments. Tr. 76. The ALJ noted Plaintiff's allegation that her husband assisted her

---

WL 5439087, at *5 (E.D.N.C. Aug. 15, 2011) ("[A]n ALJ's step-three finding will be upheld, even where she fails to explicitly address why specific listings were not met, where she has discussed in detail the evidence presented and adequately explained her consideration thereof."); *Jones v. Astrue*, No. 07-cv-452, 2009 WL455414, at *3 (E.D.N.C. Aug. 7, 2009) (finding that "it is not necessarily reversible error" where the ALJ does not include "his substantive discussion of

with dressing and tying her shoes; however, the ALJ noted Plaintiff stated she was capable of handling self-care and personal hygiene other than needing assistance getting in and out of the bathtub and on and off the toilet (ex. 9E2). Tr. 76.

The court has considered Plaintiff's challenges to each of these areas of mental functioning but finds the ALJ's determinations are supported by substantial evidence. Plaintiff's argues that she has "at least a marked" limitation in the area of adapting and managing oneself, "an extreme" limitation in the area interacting with others, and "more than a moderate" limitation in the area of concentration, persistence, and pace. Pl.'s Br. 4-5. However, Plaintiff does no more than look to pieces of subjective evidence she believes supports her own assessment of her mental functioning. *See Bowen v. Yuckert*, 482 U.S. at 146 and n.5 (noting the claimant has the burden of showing that her impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires her to furnish medical evidence regarding her condition). The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek*, 428 F.2d at 1157–58. Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence—that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401. Here, the ALJ considered Plaintiff's mental limitations in restricting her to simple, routine, repetitive work with no production rate pace, frequent (not constant) interactions with coworkers, and only occasional interaction with the public. Tr. 77. The ALJ did not err in finding Plaintiff had not established a per se disability under Listing 12.04 (or any other listed impairments).

In addition, the court notes the ALJ considered and gave great weight to the opinions of the agency medical consultants, including Manhal Wieland, Ph.D., who opined that Plaintiff's

the evidence" at steps two and three, but rather, at a later step).

psychiatric condition did not rise to listing-level and did not preclude performance of simple tasks in the work setting. Tr. 80 (citing ex. 1A13, Disability Determination Explanation summary of the Paragraph B criteria). Dr. Wieland opined Plaintiff had mild restriction of the activities of daily living; moderate difficulty in maintaining social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation. Tr. 159.

Further, any error on the part of the ALJ in analyzing these discrete Paragraph B criteria would be harmless. As noted above Plaintiff's attempt to point the court toward evidence that could support a different conclusion is unavailing based on the applicable substantial evidence review standard. The record contains no medical documentation indicating that Plaintiff had marked or extreme limitations in any of the Paragraph B criteria. To the extent Dr. Muni addressed some of these criteria (without characterizing them as "mild/moderate/marked/extreme"), the ALJ discussed and discounted much of Dr. Muni's opinion. Any error in the analysis of the Paragraph B criteria would be harmless. *See, e.g., Morgan v. Barnhart*, 142 F. App'x 716, 723 (4th Cir. 2005) (applying harmless-error doctrine in social security appeal).

Plaintiff's first allegation of error is dismissed.

B.      ALJ's Consideration of Plaintiff's Combined Impairments and Medical Opinions

Next, Plaintiff contends the ALJ failed to assess the effect of Plaintiff's physical and mental impairments in combination as required by 20 CFR § 404.1523. Plaintiff argues the ALJ considered her impairments only linearly and did not consider "any two impairments together[,]" thereby violating the requirement that the ALJ consider all of her severe and non-severe mental and physical impairments throughout the disability-determination process. Pl.'s Br. 11. Particularly, Plaintiff points to conclusions by Plaintiff's general practitioner, Dr. Payam

Yousefian; cardiologist Charlie Devlin, M.D.; and consulting psychologist Dr. Muni. *Id.* Plaintiff argues she was "further prejudiced by the ALJ's abuse of discretion in failing to adequately recognize the opinions and substantial weight of the evidence proving that the combined effect of her impairments renders her disabled." Pl.'s Br. 7. This portion of Plaintiff's argument focuses not as much on the ALJ's treatment of the medical opinions themselves but on the ALJ's alleged failure to consider the combined impact of the opinions. The Commissioner responds that the ALJ adequately considered all impairments in combination, including the medical records and opinions of Dr. Yousefian, Dr. Devlin, and Dr. Muni. Def.s' Br. 13-14.

In considering Plaintiff's challenge, review of the opinion evidence Plaintiff highlights and the ALJ's decision as it relates to combined impairments and opinion evidence is instructive.

1.     Opinion evidence and the ALJ's consideration of it

    a.     Dr. Yousefian

Plaintiff first looks to a November 8, 2017 opinion letter from Plaintiff's primary-care physician, Dr. Yousefian. Pl.'s Br. 6. As an initial matter, the undersigned notes that the November 8, 2017 letter was provided more than a month after the ALJ's September 25, 2017 decision, and the Appeals Council advised Plaintiff that neither that letter nor other post-September 25, 2017 proffered evidence would be considered because it did not relate to the period at issue. Tr. 2. Although not added as an exhibit considered by the Commissioner, the November 8, 2017 letter of Dr. Yousefian is available in the court transcript. In the letter Dr. Yousefian notes Plaintiff "has been a patient of [Family Medicine Centers of South Carolina/Woodhill Family Medicine], lists various conditions that are part of Plaintiff's "history," and opines, "Due to [Plaintiff's] multiple comorbidities and polypharmacotherapy, she is unable to work." Tr. 38. The Commissioner does not raise the timeliness issue in his brief;

rather, he argues the November 8, 2017 opinion of Dr. Yousefian is a conclusory opinion that Plaintiff is "unable to work," which is a determination reserved exclusively for the Commissioner, and that the ALJ appropriately considered Dr. Yousefian's treatment records. Def.'s Br. 13-14. Because the belated opinion is not a part of the record in this matter the court need not consider it further. In any event, review of Dr. Yousefian's treatment records that were considered by the ALJ, one of which that contains a similar statement, is appropriate.

The record includes numerous treatment notes from Dr. Yousefian or his practice, Woodhill Family Medicine. *E.g.*, Tr. 500-36 (treatment records from Oct. 10, 2013 through Nov. 24, 2014), 566-71 (Mar. 17, 2015 through Apr. 6, 2015), 577-600 (Apr. 29 through May 12, 2015), 601-06 (June 19, 2015, 623-644 (June 12, 2015 through Sept. 11, 2015); 645-746 (Sept. 10, 2015 through Mar. 14, 2016, Apr. 29, 2016 through Jan. 30, 2017), 760-80 (Apr. 13, 2016 through Jan. 25, 2017), 783-832 (July 24, 2015 through Mar. 15, 2017). The ALJ's detailed discussion of Plaintiff's various diagnoses includes several references to treatment by Dr. Yousefian's practice. For example, the ALJ looked to Dr. Yousefian's records in discussing Plaintiff's non-severe impairment of migraines, noting the March 17, 2015 treatment note that references Plaintiff's history of intermittent migraines. However, the ALJ noted there was no indication that migraines limited Plaintiff's ability to perform work activities. Tr. 74 (citing ex. 16F2). The ALJ looked to Dr. Yousefian's records in considering Plaintiff's diabetes and peripheral neuropathy, both were found to be stable in a February 2017 visit. Tr. 78 (citing exs. 10F7, 32F8). The ALJ also looked to records from Dr. Yousefian, among others, in considering Plaintiff's complaints of joint dysfunction. Tr. 78. The ALJ noted September 2014 records that indicated some degenerative arthritic changes involving the elbow, an April 2016 MRI of the

right knee that showed normal findings, and a 2017 review of systems that indicated no joint pain. Tr. 78 (citing exs. 10F5, 24F2, 32F13).

The ALJ discussed an October 9, 2014 treatment note of Dr. Yousefian, which Plaintiff's counsel characterized as an opinion. Tr. 80. Dr. Yousefian's October 9, 2014 treatment notes indicate the following under the notation "S":

> The patient is a 51-year-old pleasant African-American female. The patient has multiple comorbidities and is under the care of a multispecialty team. Unfortunately, due to her multiple comorbidities the patient has difficulty continuing to maintain meaningful employment. The patient has a history of GERD, hypertension, dyslipidemia, diabetes mellitus, diabetic gastroparesis, history of diverticulosis/diverticulitis, obesity, periodic limb movement disorder, fibrocystic breast disease, osteoarthritis, pulmonary embolus, nonobstructive coronary artery disease, vitamin D deficiency, as well as diabetic neuropathy. The patient is on multiple medications. She is currently taking vitamin D, lisinopril, Dexilant, Ultram, potassium chloride, Toprol XL, Xarelto, Ambien, Lipitor, Estrace cream, Elavil, Flexeril, Ferro-Sequels as well as Restoril with Maxzide.
>
> As a result, the patient is unable to maintain a meaningful employment due to these multiple comorbidities as well as the frequent medication intake.

Tr. 502. Dr. Yousefian's October 9, 2014 observations include a comment that Plaintiff was "in mild-to-moderate distress due to her current condition." Tr. 502. Plaintiff's abdomen was obese and nontender, and she had bilateral trace edema in her extremities. Neurologically, Plaintiff was noted to be alert and oriented; psychiatrically, she was noted to have a normal mood and affect. *Id.* Dr. Yousefian then notes Plaintiff's GERD is worsening, her hypertension is well-managed with medication, she continues with medication for dyslipidemia and diabetes, her diabetic gastroparesis is stable, her history of diverticulosis/diverticulitis is noted. *Id.* Plaintiff was advised to continue with diet and exercise as tolerated and light exercise were discussed for her osteoarthritis. It is noted that she is under care of cardiology and that, regarding her pulmonary

embolism, she continues with medication and her recent "D-dimer"[9] was within normal limits. Tr. 503. Dr. Yousefian closed his October 9, 2014 treatment report with the following notation:

> The patient has a regular follow up. As noted, the patient is unable to carry out any meaningful employment due to her multiple comorbidities as noted.

Tr. 503.

The ALJ gave Dr. Yousefian's October 2014 statement little weight because it was not supported by any explanation and was not related to his specialty. Tr. 80. The ALJ also noted Dr. Yousefian's statement was included in the "subjective" portion of his notes, making it unclear whether it was simply what Plaintiff was telling the doctor. Even if an opinion, the ALJ discounted it because of the lack of detail or explanation of why Plaintiff could not work or as to the side effects of her medications. Tr. 80.

b.      South Carolina Heart Center and Charlie Devlin, M.D.

Prior to her September 19, 2014 alleged onset date Plaintiff visited cardiologist Charlie Devlin, M.D. Tr. 429. During her March 13, 2014 visit, Dr. Devlin noted at that time that Plaintiff was a city bus driver who had stopped that occupation but subsequently returned for what she expected to be four-to-five months. Dr. Devlin noted the occupation "has proven to be her major risk factor for thromboembolism." Tr. 429. Plaintiff agreed to continue anti-coagulation therapy while working in that occupation. *Id.*

Plaintiff returned to Dr. Devlin on November 17, 2014 for a follow-up visit. Tr. 496. In the "Reason for Visit/History of Present Illness" section of his notes, Dr. Devlin noted Plaintiff

---

- [9] A D-dimer test is a blood test used to rule out blood clots by looking for D-dimer, a protein fragment from the break-down of a blood clot. Blood clots generally start to slowly break down after they are formed, and this process releases D-dimer into the blood.
https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contentid=d_dimer (last viewed Jan. 21, 2020).

had shortness of breath and palpitations. Tr. 496. Those notes indicate Plaintiff "is no longer able to work as a city bus driver and she would like documentation that this occupation most likely contribute[s] to some of her medical issues including bursitis of the left elbow and recurrent pulmonary emboli." Tr. 496. On physical examination Plaintiff was noted to have a regular heart rhythm and no lower extremity edema. Tr. 498. Dr. Devlin diagnosed Plaintiff with a history of pulmonary embolus as to which he "suspect[ed]" she was at an increased risk because of her sedentary job of driving a school bus. *Id.* He noted she had resigned from that position. *Id.*

In a December 5, 2014 letter written to "whom it may concern," Dr. Devlin offered the following:

> Diane Lemon is a patient o[f] the South Carolina Heart Center. She previously was a city bus driver, but has had to discontinue this job. In January 2013 she had treatment for a pulmonary embolus (blood clot to the lung) and had to receive months of treatment with blood thinners. This medical issue is directly related to the prolonged hours of sitting as a bus driver and I have recommended that she not return to this job and that she be considered medically disabled.

Tr. 537.

An office visit from Dr. Devlin the same day states: "[Plaintiff] was a city bus driver and had prolonged hours of sitting. She does not feel that she would be able to return to this work without an increased risk from a medical standpoint." Tr. 538. Dr. Devlin noted that the most recent echocardiogram did not show significant pulmonary hypertension and the left ventricular systolic function was normal. Tr. 538, 541-42. In the "impression" portion of his notes, Dr. Devlin noted Plaintiff was being discontinued off of a prescription anticoagulant, Xarelto, in favor of aspirin therapy. Tr. 540. Dr. Delvin noted that a letter was being provided that Plaintiff "is disabled in terms of her ability to return to her previous job as a bus driver due to the increased risk of recurrent emboli." *Id.*

Plaintiff followed up with Dr. Devlin on July 15, 2015, and reported some exertional dyspnea (shortness of breath). Tr. 614. Plaintiff's shortness of breath was assessed as both chronic and stable, and it was suspected that some of her symptoms were due to hypertension and diastolic dysfunction. Her medications were adjusted. Tr. 617. At a follow-up appointment on July 24, 2015 with respect to her complaints of shortness of breath, Plaintiff stated "she is better today and has no new symptoms." Tr. 619.

At a February 1, 2016 follow-up visit Plaintiff noted "occasional mild dyspnea" when doing "more than her usual activity." Tr. 834. This shortness of breath was diagnosed as stable. Tr. 836. At her August 29, 2016 follow-up visit Plaintiff noted she was walking and "trying to make 10,000 steps per day." Tr. 841. She had no complaints of chest pain or shortness of breath. *Id.*

Plaintiff followed up with Dr. Devlin on February 17, 2017 and reported insomnia and exertional dyspnea. She had no peripheral edema. Tr. 845. Review of her systems indicated no dyspnea at the time. Tr. 847.

The ALJ gave partial weight to the statement of Dr. Delvin in which he opined Plaintiff's pulmonary embolus was directly related to her prolonged sitting as a bus driver and his finding that Plaintiff was "medically disabled." Tr. 80 (discussing Exhibit 11F). The ALJ noted that Dr. Devlin's statement did not discuss whether Plaintiff had any other limitations nor did he define "prolonged." Further, the ALJ noted that Dr. Devlin's opinion was provided within two years of Plaintiff's suspected pulmonary embolus and that it was "unclear whether this limitation still applies since she has not experienced any repeated cardiac problems." *Id.*

  c.  Dr. Muni

Consulting examiner Paulette Muni Ph.D.'s March 2015 report is discussed above in

connection with Plaintiff's first allegation of error. *See also* Tr. 562-64. Potentially relevant here, Dr. Muni opined that Plaintiff "has the intellectual capacity to be employed." Tr. 564. She stated that Plaintiff could understand, remember, and carry out simple instructions but that Plaintiff would have difficulty with complex instructions. Tr. 564. With respect to social functioning, Dr. Muni opined that Plaintiff's "depression and anxiety make it difficult for her to interact with others" and noted it "would be emotionally difficult for her to persist in work related activity at a reasonable pace." Tr. 564.

The ALJ gave only partial weight to Dr. Muni's consultative report, finding it was based on an interview with the Plaintiff without "the benefit of seeing any records of any significant anxiety or depression problems or treatment." Tr. 80. Rather, the ALJ gave great weight to the State agency's medical consultant, Manhal Wieland, Ph.D., who opined that Plaintiff's psychiatric condition did not rise to listing-level and did not preclude performance of simple tasks in the work setting. Tr. 80 (citing ex. 1A13).

2.       The ALJ's Decision as to combined impairments

The ALJ found Plaintiff had the severe impairments of major joint dysfunction in the knees bilaterally and left elbow, major depressive disorder, generalized anxiety disorder, history of pulmonary embolism currently treated with chronic anti-coagulation therapy, diabetes mellitus, peripheral neuropathy, and diverticulitis; and the non-severe impairments of GERD and migraines. Tr. 74. The ALJ found Plaintiff did not have "an impairment or combination of impairments" that met or medically equaled the severity of a listed impairment. Tr. 75. Further, he found, "The severity of [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." Tr. 75. Additionally, the ALJ noted that he considered Plaintiff's psychiatric limitations in evaluating

her RFC. Tr. 78. The ALJ also noted Plaintiff's obesity but noted he had considered the "potential impact of obesity in causing or contributing to co-existing impairments" and found that obesity caused no more than a minimal limitation in work activities. Tr. 75 (citing SSR 02-01p).

3.      Analysis

In determining whether a claimant's physical or mental impairments are severe enough to support a finding of disability, an ALJ must consider the combined effect of all the claimant's impairments, "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. The combined effect of the individual's impairments should be considered at each stage of the disability determination process. *See id.* When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this district have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* The Fourth Circuit has not elaborated on what serves as adequate explanation of the combined effect of a claimant's impairments. *See Cox v. Colvin*, No. 9:13-2666-RBH, 2015 WL 1519763, at *6 (D.S.C. Mar. 31, 2015); *Latten-Reinhardt v. Astrue*, No. 9:11-881-RBH, 2012 WL 4051852, at *4 (D.S.C. Sept. 13, 2012). However, this court has specified that "the adequacy requirement of *Walker* is met if it is clear from the

decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), (citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). Further, absent evidence to the contrary, the courts should accept the ALJ's assertion that he has considered the combined effect of the claimant's impairments. *See Reid v. Comm'r of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

As to Plaintiff's argument regarding the opinions of Plaintiff's providers that she was "medically disabled" or unable to work, the law is clear that they need not be given any heightened value by the court. *See* 20 C.F.R. § 404.1527(d)(1), (3) (a statement that the applicant is "disabled" or "unable to work" invades the province of the Commissioner and does not have "any special significance"). A "statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(d)(1). "Legal conclusions, on the other hand, are opinions on issues reserved to the ALJ, such as 'statements[] by a medical source that [the claimant is] " disabled" or "unable to work"' . . . While the ALJ must give a treating physician's *medical opinions* special weight in certain circumstances . . . the ALJ is under no obligation to give a treating physician's *legal conclusions* any heightened evidentiary value." *Morgan v. Barnhart*, 142 F. App'x 716, 721-22 (4th Cir. 2005) (citations omitted) (emphases in original).

As to Dr. Devlin's finding, the court notes his opinion is focused on Plaintiff's being unable to return to her work as a bus driver based on the need for "prolonged sitting." The ALJ addressed the reasons for discounting this finding. Tr. 80 (noting Dr. Devlin's failure to define "prolonged" or to indicate whether other limitations existed and noting the remoteness in time of Plaintiff's pulmonary embolus). Dr. Devlin's opinion focuses on Plaintiff's inability to return to

her prior work as a bus driver, and the ALJ found Plaintiff could not return to that job. Dr. Yousefian's opinion—both the October 2014 note discussed by the ALJ and the post-decision opinion proffered by Plaintiff but not considered by the Commissioner—do not contain opinions of heightened value that were not adequately considered by the ALJ. Dr. Yousefian offers no opinion regarding which of Plaintiff's listed conditions impact her ability to work. The mere statement that she is "unable to work" based on "multiple comorbidities and poly pharmacotherapy" need not be given any heightened value by the court. *See* 20 C.F.R. § 404.1527(d)(1), (3) (a statement that the applicant is "disabled" or "unable to work" invades the province of the Commissioner and does not have "any special significance"). Here, the ALJ's decision makes it clear that he considered and weighed the treating notes and statements of Dr. Yousefian and incorporated all record-supported limitations into Plaintiff's functional capacity, but the ALJ was under no obligation to credit the doctors' legal conclusions. Tr. 77-79, 80. Nor do Dr. Muni's consultative findings alter this conclusion.

The court finds Plaintiff's allegations of error regarding consideration of her impairments in combination and regarding the opinions of Drs. Yousefian, Devin, and Muni, unavailing. Plaintiff's repeated argument that the ALJ erred by failing to discuss impairments in combination *throughout* the sequential process does not change this result. Plaintiff's second allegation of error is dismissed.

C.     ALJ's RFC

Finally, Plaintiff alleges the ALJ's RFC assessment that Plaintiff is capable of performing medium level work is not supported by substantial evidence, citing Plaintiff's statement that she can only walk "30 to 40" yards before resting, evidence of osteoarthritis in her knees that inhibited her ability to frequently bend and stoop, and evidence of problems with her left elbow

that inhibited Plaintiff's ability to lift. Pl.'s Br. 7-8. As to claims regarding the impact of Plaintiff's joint pain on her ability to bend-stoop (knee) or lift (elbow), Plaintiff argues that the ALJ's decision is not supported by substantial evidence because there are "records proving osteoarthritis in Plaintiff's knees" and an x-ray showing problems with the left elbow. Pl.'s Br. 7-8. In her reply brief Plaintiff also seems to argue that the ALJ's finding of the severe impairment of "major joint dysfunction" in her left elbow would itself preclude Plaintiff's ability to perform medium work. Reply Br. 4-5 (providing no regulatory or legal authority for this position). The Commissioner argues that the ALJ did not err in his RFC assessment and accounted for any issues with Plaintiff's ability to perform medium-level work. Def.'s Br. 15.

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*. *Id.* (emphasis in original). At the administrative hearing level the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c). An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3) and (4).

Here, the ALJ determined that Plaintiff "has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c)" except for the following:

> lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently; sitting, standing and/or walking for six hours in an eight-hour workday; she can push and/or pull as much as she can lift and/or carry; she can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; she can frequently balance, stoop, kneel, crouch, and crawl; she can have occasional exposure to hazards such as unprotected heights and moving machinery; her work is limited to simple, routine, and repetitive tasks, but not at a production rate pace; and she can have frequent interaction with supervisors and coworkers, and occasional interaction with the public.

Tr. 76-77.

The regulations define medium work as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). The ALJ noted that in making this RFC finding he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 96-4p." Tr. 77. The ALJ also noted that he considered the opinion evidence. *Id.* The ALJ discussed Plaintiff's subjective complaints and medical treatment Plaintiff received. Tr. 77-78.

Relevant to Plaintiff's allegation of error, the ALJ acknowledged Plaintiff's testimony that she had difficulty walking for more than ten minutes, but noted this was inconsistent with Plaintiff's statement to her physician that she was walking for exercise with a 10,000-step goal. Tr. 79 (citing ex. 33F9). As the ALJ noted, he asked Plaintiff about that inconsistency at the hearing, and Plaintiff advised that the 10,000 steps was merely a goal. Tr. 79. The ALJ noted, however, that walking problems were not noted in the record and that Plaintiff did not appear to have walking problems. Tr. 79.

In considering Plaintiff's allegations of joint pain that would preclude work, the ALJ found the following:

> As for the claimant's major joint dysfunction, she reported complaints of pain in her knees and left elbow. According to the medical records, images of the claimant's knees in May 2015 showed mild tricompartmental osteoarthritic changes (Exhibit 18F1), and the X-rays' result of the claimant's left elbow in September 2014 were consistent with degenerative arthritic changes involving the medial half of the elbow joint with some spur formation of the triceps tendon insertion (Exhibit 10F5). However, an MRI of the claimant's right knee in April 2016 showed normal findings (Exhibit 24F2), and a review of her systems in 2017 revealed that she was negative for joint pain (Exhibit 32F13).

Tr. 78. The ALJ concluded that the record medical evidence supported the restrictions set out in the decision. "However, the existence of symptoms does not translate directly to an inability to perform work related activities in all cases, and the record shows that [Plaintiff's] physical symptoms have not manifested even to the point that she has complained of them to treating sources or that would otherwise indicate an inability to perform work within a range of medium exertional level." Tr. 79. The ALJ further noted the following:

> The claimant also testified about constant joint pain; however, the evidence shows that she denied any chronic pain on April 29, 2015 (Exhibit 18F4) and I note that she had normal gait with no complaints of pain in April 2016 (Exhibit 24F6). Additionally, the record shows some complaints of knee pain, but the X-rays showed this to be mild osteoarthritis (Exhibit 18F1) and an MRI of the claimant's right knee revealed normal findings (Exhibit 24F2). . . . I also note that the claimant testified to having the inability to lift more than ten pounds due to a prior right wrist surgery; however, the medical evidence of record does not support this allegation. Although there is an X-ray showing problems in the left elbow (Exhibit 10F5), the claimant did not make any reference to it being the cause of her difficulties with lifting. Furthermore, I did not note any significant complaints concerning problems with her left elbow or right wrist in the medical evidence of record, all of which would be inconsistent with allegations of having a significant impairment from these conditions.

Tr. 79.

The ALJ has the duty to weigh the evidence, resolve material conflicts in the record, and decide the case accordingly. *See Richardson v. Perales*, 402 U.S. at 399. Here, the ALJ considered the entire record, and substantial evidence supports the RFC determination. As required by 20 C.F.R. § 404.1545, the ALJ considered and addressed Plaintiff's ability to meet the demands of medium-level work. Tr. 77-80. The ALJ's analysis of the evidence provides a logical bridge between the evidence and the RFC findings. *Bennett v. Astrue*, No. 1:10-CV-1931-RMG, 2011 WL 2470070, at *3 (finding the ALJ's RFC assessment consistent with the regulations and "that the ALJ's opinion sufficiently explained how he determined Plaintiff's RFC"). Contrary to Plaintiff's argument on reply, the ALJ's finding that Plaintiff's "severe

impairments" included "major joint dysfunction in the knees bilaterally and left elbow" does not automatically mandate a finding that Plaintiff cannot perform medium work. Rather, a severe impairment is one that "significantly limits" the ability to perform work functions. 20 C.F.R. § 404.1520(c). The ALJ considered the medical evidence in conjunction with Plaintiff's complaints and determined she was able to work at the medium-exertion level. At this juncture the court is not to "determine the weight of the evidence" nor is it to "substitute [its] judgment" for the Commissioner's if the Commissioner's decision is supported by substantial evidence. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is not for the court to second-guess the factual determinations of the ALJ. *See Glenn v. Saul*, No. CV 8:18-02678-MGL, 2019 WL 6207775, at *3 (D.S.C. Nov. 21, 2019). Here, the ALJ's RFC assessment is supported by substantial evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. The Commissioner performed an adequate review of the whole record evidence and that the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under the Act, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

January 28, 2020                                             Kaymani D. West
Florence, South Carolina                                United States Magistrate Judge